UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREW JACKSON, JR.,

        Plaintiff,

v.

RONALD J. DUPUIS AND
JAMES M. VOGLER,

        Defendants.

_____/

Case No. 15-10678

Honorable Nancy G. Edmunds

## OPINION AND ORDER DENYING DEFENDANT VOGLER'S
## MOTION FOR SUMMARY JUDGMENT [39] AND DENYING DEFENDANT
## DUPUIS'S MOTION FOR SUMMARY JUDGMENT [41]

This civil rights lawsuit arises out of Plaintiff's arrest on January 12, 2015.  On May 27, 2015 the Court dismissed Plaintiff's claims but allowed him to replead his excessive force claim with greater specificity.  (Dkt. # 22, Pg ID 280).  Plaintiff filed a Second Amended Complaint on May 28, 2015. (Dkt. # 23).  Currently before the Court are Defendant James M. Vogler's Motion for Summary Judgment (Dkt. # 39) and Defendant Ronald J. Dupuis's Motion for Summary Judgment (Dkt. # 41).  Defendant officers argue that they are entitled to qualified immunity, and that their use of force was objectively reasonable because Plaintiff was actively resisting arrest and refusing to move his arms to be handcuffed.  Plaintiff maintains that he was not resisting arrest, and that Defendants severely kicked and beat him after he was handcuffed, face down on the ground.  For the reasons stated below, this Court DENIES Defendants' motions.

## I. FACTS

Defendants Grosse Pointe Park Public Safety Department Officer James M. Vogler ("Vogler") and Highland Park Officer Ronald J. Dupuis ("Dupuis") were assigned to the ACTION Auto Theft Task Force, a multi-jurisdictional task force. (Dkt. # 39-2, Pg ID 405, 408). On January 12, 2015, Vogler received a phone call from a vehicle GPS tracking service, which reported the location of a stolen vehicle in the City of Detroit. *Id.* at 408. Vogler conducted a LEIN check, which indicated that the vehicle was registered to Phyllis Knox and had been reported stolen to the Detroit Police Department ("DPD") on that date. *Id.* Vogler received information from DPD that the vehicle was taken in an armed robbery by a black male approximately 50 years old with a salt and pepper beard, wearing a black security guard coat and armed with a semiautomatic handgun. *Id.* Vogler notified the ACTION officers and began driving to the location of the stolen vehicle. *Id.*

While en route, Vogler received a second call from the GPS tracking service reporting that the stolen vehicle had moved to a different location. *Id.* Vogler and other ACTION officers responded to that area and began surveillance of the vehicle. *Id.* At approximately 1:30 p.m., one of the officers notified all team members that a subject matching the description of the carjacking suspect, and later identified as Plaintiff Andrew Jackson, Jr. ("Plaintiff" or "Jackson"), had entered the stolen vehicle. *Id.* Jackson drove the stolen vehicle to another location, and the ACTION officers followed. *Id.* Jackson parked in a driveway, and three officers, including Dupuis, exited their vehicles and approached Jackson as he exited the vehicle. *Id.* Jackson fled on foot and, according to Vogler, he grabbed his right side near his hip. *Id.* Dupuis pursued him on foot, as the other ACTION officers attempted to drive to a position to intercept Jackson. *Id.* Dupuis then notified the

2

ACTION officers that he had Jackson, and additional officers arrived on the scene within minutes. *Id.* Vogler was the first officer to reach Dupuis and Jackson.

According to Vogler, he arrived to find Dupuis on the ground attempting to place Jackson in handcuffs, and Jackson resisting arrest by pulling his arms away and under his body. *Id.* Vogler saw Jackson pull his right arm under his body with his right hand reaching toward the pocket on the right side of his overalls. *Id.* Dupuis then yelled, "Give me your arm!" *Id.* Fearing that Jackson was reaching for a weapon, Vogler kicked Jackson twice in his right thigh, in the area of the common peroneal. *Id.* at 409. In his affidavit, Vogler attests that this is a common law enforcement tactic used to gain control of a non-compliant arrestee. *Id.* at 405. Dupuis was then able to put the handcuffs on Jackson. *Id.* at 409. Vogler conducted a search and discovered a semiautomatic handgun in the right pocket of Jackson's overalls. *Id.*

At his deposition, Jackson denied any carjacking and denied having a gun on his person. (Dkt. # 44-1, Pg ID 739, 748). He testified that, on January 12, 2015, he had a flat tire and that his cousin paid a friend for the use of the vehicle, which happened to be the stolen vehicle, so that Jackson could go get another tire. *Id.* at 739-40. Jackson testified that he does not know his cousin's friend's name. *Id.* at 739. About an hour and a half after obtaining this vehicle, Jackson was approached by the officers. *Id.* at 739, 741. According to Jackson, he ran from the police because he was in violation of his parole. *Id.* at 741. He knew he was running from the police because he saw their badges, which the officers were wearing around their necks, while he was fleeing. *Id.* at 743. Jackson eventually got tired and could not run anymore. *Id.* at 741. Dupuis caught up to him, ordered him on his knees, and shot him with a taser. *Id.* Jackson testified that the taser

did not work because he was wearing a heavy Carhart suit. *Id.* Dupuis then pulled out his service revolver and ordered Jackson to lie face down on the ground and put his hands on his head. *Id.* Jackson testified that he complied and that Dupuis handcuffed him. *Id.* Dupuis then began beating him. *Id.* According to Jackson, Dupuis hit him between ten and twenty times in the face, eyes, head, and neck with an object or his fist after handcuffing him. *Id.* at 742.

Jackson testified that, after this initial beating, Dupuis contacted the other officers. *Id.* Vogler arrived within a minute and kicked him. *Id.* Dupuis and Vogler kicked him and punched him after he was handcuffed, and the beating lasted approximately three minutes. *Id.* at 742, 744, 749. Jackson knows that Vogler kicked him on his right side, but he does not remember how many times Vogler kicked and punched him or exactly where on his body. *Id.* at 749. Jackson testified that he knows Vogler also punched him because he saw this in a video of the incident on the news, but he has no independent recollection of this. *Id.* Jackson further testified that he was in a daze by the time that Vogler arrived on the scene. *Id.* at 750.

A video taken by a third-party witness differs in part from both the officers' and Jackson's accounts of the incident. (Dkt. # 39-3). The Livonia Police Department Computer Forensics Unit extracted this video from the witness's phone. (Dkt. # 39-4). The video begins with Jackson face down on the ground and Dupuis on top of him (straddling Jackson with his back to the camera). (Dkt. # 39-3). Vogler is standing to the right of them. It is not possible to tell from the camera angle where Jackson's arms are in that moment. They could be behind his head, as he claims, or they could be under his body, as the officers claim. The video shows Dupuis punching Jackson four times in a row. He delivers

the first two punches and then says, "Give me your f***ing arm, give me your arm!," as he delivers the following two punches. Vogler delivers two kicks to Jackson's right thigh area, as Dupuis is yelling for Jackson's arm. Part of Jackson's right arm then becomes visible for a brief moment, but it is not possible to tell where the arm came from. One can hear the locking of the handcuff as Dupuis finishes the handcuffing. Dupuis then smacks Jackson with an open hand, gets up, and calls him a "f***er." He walks away, and Jackson is heard mumbling face down on the ground. Vogler then places a knee on Jackson's back and left arm and leans his body weight into his knee several times, pressing it down on Jackson's left side. Vogler states, "What did you say? Jesus? You're calling Jesus? Don't you dare! Don't you f***ing dare!," as he smacks Jackson with an open hand in the area around his face. Vogler then backs away from Jackson. Dupuis walks toward Jackson again and turns him around on his back with some force while saying, "You think you can outrun me, b****? You think you can outrun me, b****?" The camera begins to shake, and a third officer walks into the frame, so it is difficult to tell whether Dupuis kicks Jackson or not while turning him around. A fourth officer arrives, and the officers help Jackson to his feet and search him. One of the officers states, "That was a justified a** whopping." Vogler eventually pulls a gun out of Jackson's right pocket. The officers then escort Jackson into a patrol vehicle. Photographs taken on January 14, 2015 at the Grosse Pointe Park Police Department holding cells show Jackson's right eye swollen shut. (Dkt. # 41-2, Pg ID 566, 658-59).

On January 13, 2015, the day after Jackson's arrest, Phyllis Knox, the carjacking victim, identified Jackson as the individual who pulled a gun on her and took her vehicle the day before. (Dkt. # 39-2, Pg ID 409-10). Although Jackson maintains his innocence, he

5

was convicted of several felonies, including armed robbery, carjacking, felon in possession of a firearm, carrying a concealed weapon, felonious assault, felony firearms, and assaulting/obstructing/resisting police officers, following a bench trial.[1] Jackson is currently serving a 47-year sentence.

Michigan State Police investigated the incident and turned the investigation over to the Wayne County Prosecutor. (Dkt. # 39-5). The Wayne County Prosecutor determined that no charges would be brought against the officers, adding as follows:

> There is no question that some of the actions of Dupuis and Vogler were inappropriate and, as an office, we obviously do not condone the striking of any persons in police custody, regardless of how minor that contact may be. Neither Dupuis nor Vogler should have smacked Jackson once he was handcuffed; however, it is my opinion that those actions do not rise to the level of criminal charges.

(Dkt. # 41-2, Pg ID 690).

## II. DUPUIS'S REQUEST FOR JUDGMENT ON THE PLEADINGS

As a preliminary matter, the Court notes that Defendant Dupuis filed a Motion for Summary Judgment, citing Rule 56 of the Federal Rules of Civil Procedure; however, Dupuis also cites the standard for a motion to dismiss. Dupuis argues that Plaintiff's Second Amended Complaint does not meet the heightened pleading standard set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), because Plaintiff has not alleged specific conduct on the part of Dupuis that violated his rights. Dupuis filed an answer to Plaintiff's Second Amended Complaint. (Dkt. # 24).

---

[1] *See* Michigan Department of Corrections, Offender Tracking Information System Profile for Andrew Jackson, https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=243078, last visited Feb. 28, 2018.

Accordingly, the Court will consider Dupuis's request under Rule 12(c) of the Federal Rules of Civil Procedure.

### A. Standard of Review

Federal Rule of Civil Procedure 12(c) authorizes parties to move for judgment on the pleadings "[a]fter the pleadings are closed — but early enough not to delay trial." Fed. R. Civ. P. 12(c). Motions for judgment on the pleadings are analyzed under the same standard as motions to dismiss under Rule 12(b)(6). *See Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 284 (6th Cir. 2010). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.*

The Sixth Circuit has noted that under the United States Supreme Court's heightened pleading standard laid out in *Twombly* and *Iqbal*, "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Assoc.,* 714 F.3d 920, 924-25 (6th Cir. 2013) (internal quotation marks and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks and citations omitted). Furthermore, "[w]hile the plausibility standard is not akin to a 'probability requirement,' the plausibility standard does ask for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[O]n a motion to dismiss, courts are not bound to

accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

### B. Analysis

Dupuis argues that Plaintiff's Fourth Amendment claim is vague, unspecific, and implausible. Plaintiff does not directly respond to this argument.

In his Second Amended Complaint, Plaintiff alleges that Defendants placed him under arrest, that he did not resist arrest, and that he followed all officer commands. Plaintiff further alleges that, after being handcuffed while face down on the ground, Defendants severely kicked and beat him, and that Dupuis gratuitously struck him in his head. (Dkt. # 23, Pg ID 284).

The sole constitutional standard for evaluating claims of excessive force during the course of an arrest is the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Court concludes that Plaintiff's assertions, if believed, may give rise to an excessive force claim against Dupuis. Accordingly, the Court denies Dupuis's request.

## III.  MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotation marks omitted). When reviewing the record, "the court must view the evidence in the light most favorable

to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The nonmoving party's version of the facts must be relied upon unless blatantly contradicted by record evidence, such as a video recording. *Scott v. Harris*, 550 U.S. 372, 378, 380-81 (2007).

### B. Analysis

#### 1. *Qualified Immunity*

Dupuis and Vogler argue that they are entitled to qualified immunity on Plaintiff's excessive force claim. Plaintiff responds that there are genuine issues of material facts to preclude summary judgment.

Government officials are entitled to qualified immunity where their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Green v. Reeves*, 80 F.3d 1101, 1104 (6th Cir. 1996) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A government official will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the action at issue was lawful; but if the officer of reasonable competence could disagree on this issue, immunity should be recognized. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is an initial threshold question the court is required to rule on

early in the proceeding so that the costs and expenses of trial are avoided where the defense is dispositive. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*

The first inquiry to determine qualified immunity is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). If no constitutional right would have been violated, there is no necessity for further inquiries concerning qualified immunity. *Saucier*, 533 U.S. at 201. If a violation could be made out, the next step is to determine whether the right was clearly established in light of the specific context of the case, not as a broad general proposition. *Id.* Under the doctrine of qualified immunity, an official will not be found personally liable for money damages unless the official's actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. The "clearly established" rights allegedly violated by the officials cannot be considered at an abstract level, but must be approached at a level of specificity: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "Reasonableness" is a question of law to be decided by the trial court.

   *2. Excessive Force*

Vogler and Dupuis argue that they are entitled to qualified immunity because their use of force was objectively reasonable and did not violate Plaintiff's constitutional rights. They stress that Plaintiff was suspected of armed carjacking, that the officers had reason to believe that Plaintiff was armed, and that Plaintiff actively resisted and attempted to evade arrest. Vogler and Dupuis further argue that Plaintiff can present no case law clearly establishing that their actions violated the Fourth Amendment.

Plaintiff responds that, viewing the facts in the light most favorable to Plaintiff, Defendants' use of force was not objectively reasonable and violated Plaintiff's constitutional rights because Defendants beat Plaintiff while he was lying face down, handcuffed, and not resisting arrest. Plaintiff argues that it is clearly established that there is no need for force after an arrestee has been subdued such that he is no longer trying to flee and no longer a threat to anyone.[2]

Where a plaintiff complains of excessive force in the course of an arrest, investigatory stop, or other seizure, the claim must be analyzed under the Fourth Amendment's objective reasonableness standard, not under a substantive due process standard. *Walton v. City of Southfield*, 995 F.2d 1311, 1342 (6th Cir. 1993) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The proper application of the objective reasonableness standard "requires

---

[2]In addition to his excessive force argument, Plaintiff's Response contains one paragraph arguing that Defendants were deliberately indifferent to Plaintiff's serious medical needs following the arrest. (Dkt. # 44, Pg ID 729). The Court agrees with Defendants that this claim must be rejected, as Plaintiff failed to raise it in his Second Amended Complaint. *See* Dkt. # 23; *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (explaining that a plaintiff cannot raise a claim for the first time in opposition to a motion for summary judgment). The Court further notes that, in its May 27, 2015 Opinion and Order, the Court allowed Plaintiff to replead his excessive force claim only. (Dkt. # 22, Pg ID 280).

careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The Supreme Court has further explained:

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97. The question for the Court is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This test "requires a 'careful balancing' of the individual interest in being free from unreasonable seizures and the important governmental interest in protecting the safety of its peace officers and the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 396).

The Sixth Circuit has explained that "[t]he general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued . . . or is not resisting arrest." *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) (finding excessive force where the officer discharged pepper spray while the suspect had his hands against the wall after waiting for the officer to catch up to him without any indication of resistance). "[T]he use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (finding that

a reasonable juror could conclude that the officer's strike to the suspect's head was excessive where the suspect had surrendered before being struck, despite a prior attempt to flee). There is no governmental interest in continuing to beat a suspect after he has been neutralized. *See, e.g.*, *Phelps v. Coy*, 386 F.3d 295, 301 (6th Cir. 2002) (finding a reasonable officer would not strike on the head a suspect who has already been tackled and handcuffed); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (finding that the need for application of force is nonexistent where a suspect is handcuffed and not trying to escape or hurt anyone).

It is clearly established in the Sixth Circuit that "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional." *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 35 (6th Cir. 2005) (unpublished); *see, e.g.*, *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009) ("there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others"); *Polk v. Hopkins*, 129 F. App'x 285 (6th Cir. 2005) (unpublished) (finding the right not to be subjected to excessive force after being handcuffed clearly established where the suspect was flat on the ground, handcuffed, and did not present a threat); *Smoak v. Hall*, 460 F.3d 768, 783-84 (6th Cir. 2006) (finding that, despite the suspect suddenly jumping to his feet upon witnessing his dog being shot, a reasonable officer would have known that knocking the suspect to the ground was excessive in light of the fact that the suspect was already handcuffed); *Morrison v. Bd. Of Trustees Of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009) ("'Gratuitous violence' inflicted upon an incapacitated detainee constitutes an excessive use of force, even when the injuries suffered are not substantial.").

The Court now turns to the facts of this case. Regarding the first *Graham* factor, the severity of the crime at issue, it is undisputed that Defendants had reason to believe that Plaintiff had committed a carjacking at gunpoint, a serious felony. Plaintiff was subsequently convicted of several felonies as enumerated above. The Court finds that this factor weighs in favor of Defendants.

Regarding the second *Graham* factor, whether the suspect poses an immediate threat to the safety of the officers or others, Plaintiff was suspected of armed carjacking and had fled from the police, suggesting that he may have had something to hide. Vogler's affidavit and its attached exhibit indicate that Plaintiff continued to reach for the right side of his pants, and that the officers believed he was reaching for a gun. The video shows that Plaintiff did indeed have a gun in his right pocket. Although Defendants claim that the video shows Plaintiff continuing to reach for the right side of his pants as Dupuis attempts to handcuff him, the video is not so clear. Defendants claim that they hit and kicked Plaintiff while he was resisting and they were attempting to handcuff him. On the other hand, Plaintiff testified that, once he stopped running, he complied with the officers' directives, yet Defendants hit and kicked him after he was handcuffed. The video does not blatantly contradict Plaintiff's claim that, once he could not run anymore, he complied with the officers' directives and lay face down on the ground with his hands behind him. While the video does contradict Plaintiff's claim that the beating began after he was handcuffed, and while Dupuis can be heard giving Plaintiff loud commands to give him his arm after his first two punches but before he completes the handcuffing, the video is not clear enough to blatantly contradict Plaintiff's claim that he was no longer resisting arrest. It is not possible to tell from the camera angle where Jackson's arms are in the beginning of the

video.  Viewing the facts in the light most favorable to Plaintiff, his arms were behind him and available to the officers, and he was complying with the officers' directives when Dupuis began punching him.  Under this version of events, he was no longer an immediate threat to the safety of anyone where he was in a prone position, face down on the ground with his hands behind him and Dupuis sitting on his back straddling him.  Accordingly, this factor weighs in favor of Plaintiff.  Furthermore, even if the video did clearly show Plaintiff reaching for his right pocket such that Dupuis's initial punches and Vogler's initial kicks could be said to be objectively reasonable, later on, the video clearly shows both Dupuis and Vogler smacking Plaintiff after he is handcuffed face down on the ground, at which point he was no longer a threat.  *See McDowell*, 863 F.2d at 1307(finding that the need for application of force is nonexistent where a suspect is handcuffed and not trying to escape or hurt anyone).

Regarding the third *Graham* factor, whether the suspect is actively resisting arrest or attempting to evade arrest by flight, Plaintiff testified that he eventually could not run anymore, stopped, and  complied with the officers' directives.  According to Plaintiff, he did not resist arrest or attempt to flee after he stopped running.  Instead, he lay face down on the ground and put his hands behind him.  According to Plaintiff, Dupuis and Vogler hit and kicked him over twenty times after he was handcuffed.  According to Defendants, they hit and kicked Plaintiff while he was resisting and they were attempting to handcuff him.  Again, the video does not blatantly contradict Plaintiff's claim that he was no longer resisting arrest or attempting to flee.  The video does not show any resistance or attempt to flee on Plaintiff's part.  The video does clearly show Dupuis smacking Jackson right after he finishes handcuffing him.  The video also clearly shows Vogler placing his knee on

Jackson's back and left arm and leaning his body weight into his knee several times, pressing it down on Jackson's left side while Jackson is handcuffed face down on the ground. Vogler then smacks Jackson in the area around his face. Viewing the facts in the light most favorable to Plaintiff, he was not actively resisting arrest or attempting to evade arrest by flight during the time period depicted in the video. Accordingly, this factor also weighs in favor of Plaintiff.

The Court concludes that there remain genuine issues of material facts to preclude summary judgment in favor of Defendants. The "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" called for in *Graham* indicates that a reasonable juror could find that Dupuis's use of force as well as Vogler's use of force, in particular their post-handcuffing use of force, violated Plaintiff's Fourth Amendment right to be free from excessive force. Sixth Circuit precedent addressing the use of force on handcuffed individuals who have been subdued and neutralized is clear and was established prior to January 2015, as discussed above.

## IV.     CONCLUSION

For the reasons set forth above, the Court hereby DENIES Defendant Vogler's Motion for Summary Judgment (Dkt. # 39) and DENIES Defendant Dupuis's Motion for Summary Judgment (Dkt. # 41).

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: March 1, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 1, 2018, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager